Granger, C. J.
I. What right, or estate, in the 23 acre tract, if any, was vested in Upson and his associates at the time of the ouster ?
A careful examination of the instrument executed by Garrett, Beall and Baird, on May 15th, 1869, leaves the mind satisfied that the parties did not contemplate the future execution of any other conveyance by Garrett: that, as they understood it, Beall and Baird were, by the delivery of that paper, vested with all the estate and title in said premises that Garrett intended to sell to them, or that they intended to buy of him. It is true the words “ agreement,” “ agree to sell and convey,” “ contract,” and the like, are used. But so also are the words “ and also grant the exclusive right to test, open and remove said coal;” so, also, they sign, seal and acknowledge it, precisely as if it were a deed of conveyance; “ and desire that the same may be recorded as such.” It is a well settled rule that the plain purport and purpose of an instrument, as a whole, should-control the ordinary meaning of particular words, so far as to make them conform to that purport and purpose.
We think that the title to the minable coal, with full right to enter and remove it, passed to Beall and Baird; that under the express words of the final clause of the deed of May 15th, 1869, their assigns fully succeeded to their rights; and, that, as the tracts of land were several, and the coal easily capable of subdivision, the conveyance to Upson was valid.
II. Did the grantees fulfil the conditions on which the continuance of the interest, or rights granted, depended? Garrett named “ at or near Straitsville ” for one end of the railroad to be aided. The other end might connect with the Hocking Valley railway, or such other railway as *25 the grantees should prefer. The grantees did, within the two years, aid a railway, that began as near to Straitsville as practicable, and connected with the Hocking Valley. This fulfilled the condition. We think the performance of the condition as to “testing” for coal is not seriously denied. Hence, on July 27th, 1872, Upson was in rightful possession as lawful owner of the coal, for himself and his associates, with full right to prosecute the business of mining, removing and selling the coal.
III. Was the second cause of action a good one ?
It may now be considered the approved doctrine, that, an action for the malicious prosecution of a civil suit may be maintained, whenever, by virtue of any order, or writ, issued in the malicious suit, the defendant in that suit has been deprived of his personal liberty1', or of the possession, use, or enjoyment, of property of value. The name, or form, of the writ, or process, is immaterial. It may be an order of arrest, or of attachment, or of injunction.
The malicious prosecutor cannot shield himself behind the interlocutory order of the judge, based upon his own malicious, éx parte application and affidavit.
IV. By what rule should the damages be assessed ?
There being no market value of the rights taken from Upson and his associates, the only practicable rule for settling that value, is to follow, the ordinary common sense practice of business men. Make known to the body charged with the assessment, as fully as legal evidence can do it, all the facts that naturally, and materially, affect the value of the use of the rights of which the plaintiffs below were wrongfully deprived. These facts necessarily include the location, thickness, quantity and value of the coal that was mineable there and then; the facilities for transporting that coal to a market; the nature and extent of the demand for that coal; the total expense of placing it in the market (this included also all preliminary expenditures) ; the competition with which they must contend; the contingencies in the demand and supply of labor; the relation of the 23 acres to other mining lands of Upson and *26 his associates, for which they could use part, or all, of the same approaches ; the total cost of the coal to them, and the. prices for which it was saleable during the period of the suspension; all these are facts naturally affecting the value of the right to prosecute that business with that coal, at and from that place, during that time. No one of them is by itself a measure of the value. Considered together, some of them add to, others subtract from the value; and then, after such a view, a common sense judgment again subtracts a percentage for the contingencies that are ever presenting themselves in the affairs of men.
Within these facts thus stated is the element of “profit on possible sales of. coal,” i. e. the difference between the cost of it and its market price. But it is there not as a measure of value; not in order to be allowed by the jury “ as profits,” but to be treated as one of a mass of facts that throws light upon the value of the use of- the rights taken from Upson, all of which the jurors ought to have known and considered when computing the damages. As we understand the charge to the jury, it instructed them to ascertain the value of the use in question by considering the evidence bearing upon the classes of facts hereinbefore enumerated. Inasmuch as it was the duty of the jury to consider the element of profits in the manner above described, the judge did not err when he omitted to charge as the defense below desired. Upon the remaining alleged errors complained of in the record, we hold against the plaintiff in error, upon.established rules of law and practice, and therefore without naming them, we affirm the judgment of the District Court.

Judgment accordingly.